<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MEELEE KIMBER-ANDERSON, SHERRI FRANKLIN, YEDDA MASON, LORETTA YOUNGBLOOD, and ZARIFA WILSON,<br><br>              Plaintiffs,<br><br>v.<br><br>THE CITY OF NEWARK, FIRE DIRECTOR DAVID J. GIORDANO, and NEWARK FIRE DEPARTMENT<br><br>              Defendants. | Civ. No. 08-6309 (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

MARK B. FROST & ASSOCIATES
By:    Mark B. Frost, Esq.
Pier 5 at Penn's Landing
Philadelphia, Pennsylvania 19107

      *Attorney for Plaintiffs*

HARDIN KUNDLA, McKEON & POLETTO, P.A.
by:    Jeffrey A. Oshin, Esq.
673 Morris Avenue
Springfield, New Jersey 07081

      *Attorney for Defendant City of Newark*

THE TOSCANO LAW FIRM, LLC
by:    Lauren Chaump, Esq.
80 Bloomfield Ave.
Suite 101
Caldwell, New Jersey 07081

      *Attorney for Defendant City of Newark*

**DEBEVOISE, Senior District Judge**

This case arises out of claims by several female fire prevention specialists that they were discriminated against and forced to endure a hostile work environment due to the hiring and preferential treatment of unqualified male co-workers. Plaintiffs seek damages from The City of Newark, the Newark Fire Department, and Newark Fire Director David J. Giordano under 42 U.S.C. § 1983 and the New Jersey Law Against Discrimination ("LAD") N.J.S.A. 10:5 *et. seq*.

Presently before the Court are Motions for Summary Judgment filed by Defendants The City of Newark and Giordano.[1] For the reasons set forth below, Defendants' Motion is GRANTED. Plaintiffs' complaint is DISMISSED.

## I.  BACKGROUND

Plaintiffs are five female fire prevention specialists ("FPSs" or in the singular, "FPS") who have worked in the Newark Fire Department since at least 2002. (Giordano SOF ¶ 1)[2]. An FPS is a civilian position within the Fire Prevention and Safety Division of the Newark Fire Department.[3] As FPSs, Plaintiffs are responsible for inspecting buildings for compliance with the Fire Code, addressing Fire Code violations, issuing permits, and responding to complaints relating to fire prevention and safety. Id.

The State of New Jersey issues a certification to FPSs upon completing defined course work and passing a state administered licensing examination. Id. at ¶ 2. According

---

[1]    Defendant Giordano appears both in his official capacity as head of the Newark Fire Department and individually.

[2]    For simplicity, all citations to Defendants' moving papers will be to the papers filed by the City of Newark unless otherwise indicated.

[3]    By way of hierarchy, all FPSs report to three supervisors within the Fire Prevention and Life Safety Division of the Newark Fire Department. These supervisors in turn report to the head of the Division. Defendant Giordano has supervisory responsibility over the entire Fire Department, including the Fire Prevention and Life Safety Division.

to job specifications put forth by the Fire Department, this certification is required for the FPS position. (Pl. Ex. N). Some aspects of the job, in particular the inspections and permits associated with a category of building known as a "Life Hazard Use," cannot be legally performed by an FPS who is not certified. (Giordano SOF ¶ 2). Each Plaintiff was properly certified at the time that she was hired as an FPS or shortly thereafter. [4]

In July of 2006, the Fire Department hired several new FPSs. Id. at ¶ 5. Each was male, and none possessed necessary coursework or licensing to perform Life Hazard Uses. Id. The male FPSs were hired as "provisional" employees, and it appears that they were expected to eventually become certified, though only two ever did. Id. at ¶¶ 5-6. Plaintiffs claim that the male FPSs were unqualified and received preferential treatment because of their sex. (Pl. Br. 1). Plaintiffs further allege that they have suffered a hostile work environment because of the presence of the unqualified male co-workers and the harassment that they received from the same. Id.

Plaintiffs detail various categories of preferential treatment. First, Plaintiffs claim that the male FPSs were hired by the Fire Department through a corrupt process and were not licensed for their positions. (Pl. Br. 7-8). They further argue that the male FPSs were poor employees, who occasionally came to work intoxicated and lacked the skills and the work ethic to perform their jobs effectively. Id. at 12-13. Plaintiffs cite to the requirements promulgated by the city which require that all FPSs be certified for Life Hazard Uses before starting work. (Pl. Ex. N). Plaintiffs also attach deposition testimony

---

[4]      At the time that this case was filed, all Plaintiffs worked as FPS's for the Newark Fire Department. There is a factual dispute as to whether Plaintiff Wilson is still employed as an FPS, but all other Plaintiffs are still in the position.

supporting their claim that the male FPSs went through an abbreviated hiring process and were ineffective employees.[5] (Pl. Ex. M. at 23).

Second, Plaintiffs state that the male FPSs had their coursework paid for by the city and the Plaintiffs, who took certification classes before they were hired, did not. (Pl. Br. 9). In response, Defendants submit that all current city employees were eligible to have their coursework paid for by the city and that two of the Plaintiffs, Youngblood and Wilson, themselves took advantage of this benefit. (Def. Br. 5-6).

Third, Plaintiffs charge that their pay was docked for time spent taking the continuing education classes necessary to maintain their certifications. (Pl. Br. 9). Plaintiffs further testify that the male FPSs regularly left work early to attend certification classes, and speculate that the male FPSs were not docked pay for any time missed. Id. at 20. Defendants take the position that the male and female FPSs had access to the same continuing education classes and were subject to the same policies with respect to continuing education. (Def. Br. 6).

Fourth, Plaintiffs allege that three of the male FPSs were given the use of city vehicles and the Plaintiffs were instead required to use their own vehicles to carry out their inspection duties as FPSs. (Pl. Br. 10). Defendants respond that all FPSs were entitled to either the use of a city vehicle or a vehicle stipend and that all Plaintiffs received the stipend. (Def. Br. 8-9). Defendants further note that only a few vehicles were available for FPS use during the relevant time period, and that one of the male FPSs given use of a city vehicle was not merely an FPS, but also the city's only Hazmat Inspector. Id. at 10.

_____

[5]     Indeed, all of the male FPSs that Plaintiffs describe have since been terminated from the Newark Fire Department, allegedly for budget reasons. (Def. Br. 10).

4

Fifth, Plaintiffs complain that they were required to do additional work because the unqualified male FPSs could not perform duties related to "Life Hazard Uses." (Pl. Br. 16). Plaintiffs further object that they were required to train the unqualified male FPSs without any additional compensation. Id. at 23. Defendants state in response that Plaintiffs' hours were set by collective bargaining agreement and that they were not required to work any additional hours because of the hiring of new FPSs. (Def. Br. 6). Defendants also submit that all new FPS hires are assigned for training by more experienced personnel, and that Plaintiffs themselves were trained in this fashion. Id. at 7.

Sixth, Plaintiffs claim that one male FPS received a cell phone paid for by the city. (Pl. Br. 12). Defendants explain that the male FPS who received the cell phone was the city's lone Hazmat Inspector and needed to be reachable at all times. (Def. Br. 8). Defendants further clarify that all FPSs, including Plaintiffs, were issued "chirp" phones to enable them to maintain contact with other individuals within the fire department. Id.

Last, Plaintiffs complain that one male FPS, George Smith, was paid more than they were. (Pl. Br. 14). Defendants respond that Smith was paid more pursuant to an executive order approved by the mayor and that there is no evidence that his salary was in any way motivated by gender. (Def. Br. 35).

In addition to preferential treatment accorded to the male FPSs, Plaintiffs complain of a hostile work environment within the Fire Prevention and Life Safety Division. (Pl. Br. 1). In particular, Plaintiffs charge that the "special" and "unfair" hiring of the male workers and the "preferential treatment" that they received once employed created an "atmosphere" of "animosity and resentment." Id. at 22. Plaintiffs further allege that on two occasions a Plaintiff was called a "bitch" or otherwise harassed by the male

FPSs. Id. Defendants argue that all of Plaintiffs' supervisors were female, that Plaintiffs were satisfied with their interactions with those supervisors, and that mere resentment over alleged preferential treatment coupled with a few isolated cases of improper conduct does not support a hostile work environment claim. (Def. Br. 44)

On the basis of these facts, Defendants move for summary judgment.

## II. DISCUSSION

### A.      Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact and do not merely suggest "some metaphysical doubt as to the

material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

A party must support its assertions that a fact cannot be or is genuinely disputed "by (A) citing to particular parts of materials in the record…or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(c)(1). If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may…(2) consider the fact undisputed for purposes of the motion…." Rule 56(e).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. <u>See</u> <u>Pa. Coal Ass'n v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate.

This Court will first evaluate whether Plaintiffs have standing to pursue their claims, and then examine whether material factual disputes exist with respect to each cause of action alleged.

**B.      Standing**

Defendant Giordano argues that the Plaintiffs do not have standing to bring this action. (Giordano Br. 17). "Constitutional standing has three elements, all of which must be met: (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal nexus between that injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable judicial decision." <u>Joint Stock Soc'y v. UDV N. Am., Inc.</u>, 266 F.3d 164, 174-175

(3d Cir. 2001). Standing may not be assumed, for "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (U.S. 1992).

Plaintiffs here have alleged deprivation of their statutory and constitutional rights to be accorded the same employment opportunities and treated with the same basic decency as their male colleagues. Private causes of action to enforce these rights exist under both LAD and the 1983 statute. Indeed, other litigants have been awarded damages to vindicate the rights that Plaintiffs invoke. <u>See</u> <u>e.g.</u> <u>Decker v. Board of Ed. of City of Elizabeth</u>, 153 N.J.Super 470, 475 (App. Div. 1977) (awarding damages to plaintiffs who were paid lower salary on the basis of sex) <u>cert</u> <u>denied</u> 75 N.J. 612 (1978). Plaintiffs assert claims for personal damages and do not seek to rectify generalized grievances or represent the interests of absent third parties. <u>Wheeler v. Travelers Ins. Co.</u>, 22 F.3d 534, 538 (3d Cir. 1994). (standing requires that a party must "assert his or her own legal interests rather than those of third parties," and that "courts refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances….") (internal citations omitted).

As such, to the extent that Plaintiffs' claims are cognizable on the merits, they are entirely adequate to afford Plaintiffs standing.[6]

### C.    Disparate Treatment Under LAD

Plaintiffs first allege that they received disparate treatment as the result of their sex in violation of LAD. (Pl. Br. 22). Claims for disparate treatment under LAD are evaluated under the

---

[6]    Both Defendants also argue that Plaintiffs have failed to exhaust their administrative remedies as required under Title VII. This argument is unavailing, as Plaintiffs proceed under § 1983 rather than Title VII. <u>See</u> <u>Patsy v. Board of Regents of State of Fla.</u>, 457 U.S. 496, 516, (U.S. 1982) ("exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983.").

McDonnell-Douglass burden shifting standard originally created for Title VII cases. Peper v. Princeton University Bd. of Trustees, 77 N.J. 55, 83 (N.J. 1978) ("we commend the McDonnell-Douglas standards to our trial courts as a starting point in actions brought under the Law Against Discrimination or any other State proscription against discrimination"). Under McDonnell-Douglass, a plaintiff must first establish a prima facie case for disparate treatment by showing "that: (1) [s]he belongs to a protected class; (2) [s]he was performing h[er] job at a level that met h[er] employer's legitimate expectations; (3) [s]he suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment action." Rogers v. Alternative Resources Corp., 440 F.Supp.2d 366, 371 (D.N.J. 2006). In essence this requires plaintiffs to demonstrate that "(1) that their employer took an adverse employment action against them" and "(2) that the facts of the case are compatible with discrimination being the reason" Marzano v. Computer Science Corp. Inc., 91 F.3d 497, 508 (3d Cir. 1996).

After a plaintiff has shown a prima facie case, the employer must then "offer an explanation other than discrimination why the employee suffered an adverse employment action." Id. If the employer "is unable to proffer a nondiscriminatory reason, plaintiff is entitled to summary judgment or judgment as a matter of law, as the case may be." Id. Alternatively "if the employer proffers a reason and the plaintiff can produce enough evidence to enable a reasonable factfinder to conclude that the proffered reason is false, plaintiff has earned the right to present his or her case to the jury." Id.

As an initial matter, much of Plaintiffs' brief is dedicated to the recitation of grievances about their former co-workers' lack of qualifications, training, work ethic, or sobriety. While no diligent employee enjoys working alongside the lazy or incompetent "not everything that makes an employee unhappy is an actionable adverse action." Schott v. State, No. A-2612-04T1, 2006

9

WL 1911375, *8 (App Div. July 13, 2006) cert. denied, 188 N.J. 577 (2006).[7] To make out their prima facie case, Plaintiffs must show that the Fire Department's practices were "materially adverse" to them, "meaning more than a mere inconvenience or an alteration of job responsibilities." Hilt-Dyson v. City Of Chicago, 282 F.3d 456, 465 (7th Cir. 2002).

      Consequently, none of Plaintiffs' allegations regarding the abbreviated hiring process for male FPSs or the failure of the city to remove the workers once they failed to become certified are actionable. Plaintiffs were successful at obtaining their positions and have not alleged that they were demoted, transferred, not promoted, or fired to make room for less qualified male workers. It may be that the Fire Department had a policy of hiring less competent male workers. It may also be that the Fire Department had a shortage of FPSs in 2006 and hired uncertified workers in an effort to quickly fill the ranks. In either case Plaintiffs, having received their desired jobs, have no basis to challenge the hiring process followed for other employees. No worker has the legal right to force others to undergo an identical hiring process.

      In addition to blanket complaints about the impropriety or illegality of the male FPSs employment, Plaintiffs discuss several categories of preferential treatment.

---

[7]    See also Ivan v. County of Middlesex, 595 F.Supp.2d 425, 473 (D.N.J. 2009) ("Although actions short of termination may constitute adverse employment actions, not everything that makes an employee unhappy does. Actions are not necessarily retaliation solely because they result in a bruised ego or injured pride on the part of the employee.") (internal citations omitted); Nelson v. Upsala College, 51 F.3d 383, 388 (3d Cir. 1995) (discrimination statutes ban "unlawful employment practice[s] rather than conduct in general which the… employee finds objectionable.") (internal citations omitted).

1.      **Education Expenses**

Plaintiffs allege that the male FPSs had their coursework paid for by the city and that the Plaintiffs who took certification classes before they were hired did not. (Pl. Br. 4). However Plaintiffs freely admit that Plaintiff Youngblood and Plaintiff Wilson, as city employees, had their coursework paid for by the city. Id. at note 1. Nor do Plaintiffs effectively dispute that, as a policy, all current city employees were similarly eligible to have their certification classes paid for. Instead Plaintiffs complain that the male FPSs, hired before certification, were better able to take advantage of the policy. Id.

The Court of Appeals for the Seventh Circuit decision in Bush v. Commonwealth Edison Co., 990 F.2d 928 (7th Cir. 1993), is instructive here. There the Court reviewed a racial discrimination claim dismissed by the district court. In Bush, the Plaintiff argued that he had been severely punished for his poor behavior as an employee where other similarly dreadful white employees had been more leniently punished. The court rejected this argument, noting that some minority employees had also been treated with leniency, writing:

> Of course a company cannot insulate itself from a finding of racial discrimination by pairing the firing of a black man with the firing of a white one, or by pointing to a token black whom it treated with abnormal leniency. But what is not permitted as a shield is not necessarily usable as a sword. A plaintiff cannot establish a prima facie case of racial discrimination by showing that, in a large department, a coworker of another race was treated more favorably than he, though other coworkers of his race were treated more favorably than other coworkers of other races. Such a pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination. But that is all that [Plaintiff] has.

990 F.2d at 931.

Similarly, in Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, (3d Cir. 1998), the Court of Appeals reviewed a claim of age discrimination brought by a jewelry store manager who was demoted for not meeting sales quotas. The Plaintiff in that case claimed that

11

the proffered reason for the demotion was pretexual, and pointed to a single younger store

manager who was not fired for failing to meet quotas. The Court of Appeals affirmed the lower

court's grant of summary judgment for the employer, noting that "the mere favorable treatment

of one younger manager as compared to one older manager may not be sufficient to infer age

discrimination" and that "the plaintiff can not pick out one comparator who was not demoted

amid a sea of persons treated the same as her to establish a jury question." Id. at 645-646.

(internal citations omitted).

     Here Plaintiffs strain to fashion a sex discrimination claim out of a gender-neutral policy

by pointing to men who benefited from it. By Plaintiffs' own admission, the City paid for the

certification classes taken by both men and women, provided that they were already city

employees. That some women were unable to take advantage of the policy because they were

certified before becoming city employees is of no consequence. Plaintiffs have offered no

evidence that the policy is pretextual, and can satisfy their burden to do so neither by

highlighting a few female workers who were unable to take advantage of the rule nor naming a

few male workers who were. Plaintiffs' claim fails.

     **2.**     **Compensation for Time Spent in Certification Classes**

     Plaintiffs also complain that their pay was docked for time spent taking the

continuing education classes necessary to maintain their certifications. (Pl. Br. 9). In

contrast, Plaintiffs testify that the male FPSs regularly left work early to attend

certification classes, suggesting that the male FPSs were not docked pay for time missed.

Id. Defendants take the position that the male and female FPSs had access to the same

continuing education classes and policies with respect to continuing education. (Def. Br.

6).

A blanket policy of compensating male but not female FPS workers for time spent in certification classes would clearly be actionable. But Plaintiffs have not offered any evidence on which a jury could conclude that this was the policy. The testimonial evidence cited by Plaintiffs in their briefing demonstrates only that one plaintiff was docked pay on at most two occasions. (Pl. Ex. H. 96).[8] It provides no basis for showing that male FPS workers received full pay for the days that they left early to attend certification classes. In spite of the force of their arguments, Plaintiffs have failed to introduce evidence supporting a genuine factual dispute on this issue and consequently cannot prevail on this claim.

### 3.      City Vehicles

Plaintiffs further claim that three of the male FPSs were given the use of city vehicles at one time or another. (Def. Br. 10). All other FPSs, including Plaintiffs, were required to use their own vehicles to carry out their inspection duties. Id. In defending the policy, Defendants explain that all FPSs were entitled to either the use of a city vehicle or a vehicle stipend—but not both—and that all Plaintiffs received the stipend. (Def. Br. 9). Defendants point to evidence that few vehicles were available for FPS use during the relevant time period, and that one the vehicles was assigned to the city's only Hazmat Inspector. (Def. Br. 10). Defendants also note that Plaintiff Anderson stated that she would not have taken a city vehicle even if it were offered to her. (Def. Ex. G 74-75).

The reasoning of Bush and Simpson controls here. The policy that Plaintiffs complain of has its roots in a non-discriminatory budget limitation and the need for the department to prioritize Hazmat work. While Plaintiffs did not receive automobiles,

---

[8]      Plaintiff Youngblood testified that the pay deductions "might have cost me an hour" each time, for a total loss of $44.

neither did several similarly situated men. Plaintiffs have shown no pretext and the pattern here does not deviate from what randomness or chance would predict. <u>Bush</u>, 990 F.2d at 931. Plaintiffs' claim fails.

### 4.    Work Responsibility

Plaintiffs also complain that they were required to perform additional work because of the presence of unqualified male FPSs. The male workers could not perform duties related to "Life Hazard Uses," and Plaintiffs were required to train the unqualified male FPSs without any additional compensation. (Pl. Br. 16, 23). Defendants argue that Plaintiffs' hours were set by collective bargaining agreement and that they were not required to work any additional hours because of the hiring of new FPSs. (Def. Br. 6). Defendants note that all new FPS hires were assigned for training by more experienced personnel, and that Plaintiffs themselves received this training when they were first hired. <u>Id</u>. at 7.

To constitute an adverse employment action, a policy must be "more than a mere inconvenience or an alteration of job responsibilities." <u>Hilt-Dyson</u>, 282 F.3d at 465 <u>see also</u> <u>Lewis v. City of Buffalo Police Dept.</u>, 311 Fed.Appx. 417, 420 (2d Cir. 2009) ("To show such an adverse action, a plaintiff must point to evidence of more than inconvenience; she must show an action that rises to the level of 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'") <u>quoting</u> <u>Mathirampuzha v. Potter</u>, 548 F.3d 70, 78 (2d Cir. 2008).

Here, Plaintiffs worked no additional hours because of the presence of the male FPSs. And while the uncertified FPSs could not perform all of Plaintiffs' duties, their

presence still ***decreased*** the amount of permit work that Plaintiffs were required to do. Indeed, it is hard imagine how Plaintiffs would have had less work if the Fire Department had instead fired the male FPSs once they failed to take their certification exams and thereby forced Plaintiffs to do all of the permit work themselves. While Plaintiffs would have benefited more from certified co-workers, the failure of an employer to hire the best possible employees is not itself actionable. Plaintiffs' claim that the uncertified male workers altered the balance of their responsibilities by giving them more time to devote to Life Hazard Uses that they were independently obligated to do anyway is precisely the sort of "mere inconvenience [and] alteration of job responsibilities" that does not constitute an adverse employment action. Hilt-Dyson, 282 F.3d at 465 (7th Cir. 2002). Plaintiffs' claim cannot stand.

###### 5.     Cell Phones

Plaintiffs also complain that one male FPS received a cell phone paid for by the city. (Pl. Br. 1). Defendants explain that the male FPS who received the cell phone was the lone Hazmat Inspector and needed to be reachable at all times. (Def. Br. 8). In addition, all FPSs, including Plaintiffs, were issued "chirp" phones to enable them to maintain contact with other individuals within the fire department. Id.

As above, the reasoning of Bush and Simpson, is applicable here. Only one male FPS, Hazmat Inspector Dikran Tehlikian, received a cellular telephone. The remaining FPSs, male and female, received only "chirp" phones. Even if the conferral of a benefit on a single employee were sufficient to set out a prima facie case, Defendants have offered a credible, non-discriminatory basis for making the decision—that as Hazmat Inspector, former FPS Tehlikian needed to be in constant contact with his superiors. Plaintiffs have introduced no evidence that

this reason is pretextual. As in <u>Simpson</u>, "the plaintiff can not pick out one comparator who [received a benefit] amid a sea of persons treated the same as her to establish a jury question." 142 F.3d at 645-646 (internal citations omitted). Plaintiffs' claim fails.

**6.      Salary**

Plaintiffs' final charge is that one male FPS, George Smith, was paid more than they were despite often missing work. (Pl. Br. 14). Indeed, Smith was so frequently absent that he may have owed money to the city when he left his position as FPS. <u>Id</u>. at 13. Defendants counter that Smith was paid more pursuant to an executive order approved by the mayor and that there is no evidence that his salary was in any way motivated by sex. (Def. Br. 35). Defendants further show that all other male FPSs were paid the same amount as female FPSs. <u>Id</u>.

While the record raises serious questions about why former FPS Smith was paid so much to do so little, this single example does not establish a pattern of salary discrimination. The remaining four male FPSs were paid exactly as much as Plaintiffs to perform the same duties. Plaintiffs may no more pick out a single male worker who is more highly compensated to prove their claim than Defendants may point to a single well compensated female worker or poorly compensated male worker to defend against it.[9] Under the reasoning of <u>Bush</u> and <u>Simpson</u>, Plaintiffs must show a genuine pattern of discrimination rather than a solitary example of a better treated worker.

Plaintiffs have not demonstrated any evidence of disparate treatment necessitating a jury trial. Consequently, their disparate treatment claims under LAD will be DISMISSED.

---

[9]      Indeed, Defendants have noted that a female supervisor was the only employee to receive a blackberry paid for by the city. (Def. Br. 8).

16

### D.        Hostile Work Environment Under LAD

Plaintiffs next allege that they were forced to endure a "hostile work environment" due to comments from the male employees and the "atmosphere" of "animosity" that Defendants' preferential treatment of male employees engendered. (Pl. Br. 1). "To state a hostile environment claim under the LAD, [plaintiff] must show that: the complained-of conduct (1) would not have occurred but for her gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Newsome v. Administrative Office of Courts of State of New Jersey, 103 F.Supp.2d 807, 817 (D.N.J. 2000) (citation omitted).[10]

In determining whether an environment is hostile or abusive, the court must look at several factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001) quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). The character of the conduct must be "severe enough to affect the psychological stability of a minority employee." Andrews, 895 F.2d at 1482. Indeed, sex discrimination statutes are not designed to protect employees from "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" but rather to guard against behavior that

---

[10]        See also Lehmann v. Toys R Us, Inc., 132 N.J. 587, 603-604, 453 (N.J. 1993) ("To state a claim for sexual harassment based on a hostile work environment, a female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment. For the purposes of establishing and examining a cause of action, the test can be broken down into four prongs: the complained-of conduct (1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a (3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive.*") (emphasis in original).

is so "extreme [as] to amount to a change in the terms and conditions of employment" <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).

Evaluated under this standard, Plaintiffs' allegations that preferential treatment of male co-workers led to an "atmosphere of resentment," even if true, cannot support a sex discrimination claim for a hostile work environment. <u>See</u> <u>e.g.</u>, <u>Edmonson v. Potter</u>, No. 04-1427, 118 Fed. Appx. 726, 730, 2004 WL 2980716, *3 (4th Cir. Dec. 22, 2004) (allegations of an "atmosphere of resentment" insufficient to prove a "hostile work environment."); <u>Clemente v. New York State Div. of Parole</u>, No. 01 Civ. 3945, 2004 WL 1900330, *12 (S.D.N.Y. Aug. 24, 2004) ("Plaintiff's subjective belief that she was targeted based on resentment against her as a successful Hispanic woman cannot, in itself, raise triable issues as to a discriminatory animus motivating the creation of a hostile work environment."). Plaintiffs have the right to be treated with the same respect and professionalism accorded to men in their position. But they have no legal right to a workplace free of lazy, unqualified or impolite co-workers. Nor is their personal resentment toward such co-workers legally actionable under LAD.

In addition, the two comments cited by Plaintiffs, made by a single FPS, while discourteous and unprofessional, do not support a "severe or pervasive" environment of harassment.[11] <u>See</u> <u>e.g.</u>, <u>Benny v. Pennsylvania, Dept. of Corrections, State Correctional Inst. at Somerset</u>, 211 Fed.Appx. 96, 97 (3d Cir. 2006) ("The sporadic incidents of sexually inappropriate language that plaintiff alleges do not comprise an objectively hostile work environment.").

---

[11]     Plaintiff Anderson testified that FPS Tehlikian called her a "bitch" on two occasions. (Pl. Ex. E at 60-62).

Plaintiffs have not demonstrated any evidence of a hostile work environment necessitating a jury trial. Consequently, their hostile work environment claims under LAD will be DISMISSED.

**E.     § 1983 Claims**

Last, Plaintiffs allege that Defendants' conduct violated their 14th Amendment rights to equal protection of the law.[12] (Pl. Br. 25). Plaintiffs seek to vindicate these rights under Section 1983. 42 U.S.C. § 1983 "provides a federal cause of action for the violation of a federal right." Dique v. New Jersey State Police, 603 F.3d 181, 185 (3d Cir. 2010). A plaintiff bringing a § 1983 claim must demonstrate "two essential elements: (1) the conduct complained of must be 'committed by a person acting under color of state law'; and (2) this conduct must 'deprive a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" Burton v. Kindle, No. 10-2915, 2010 WL 4487121, *1 (3d Cir. 2010) quoting Kost v. Kozakiewicz, 1 F.3d 176, 184 (3d Cir. 1993).

To prevail on an equal protection claim brought under § 1983, the plaintiff must show that he or she was subjected to intentional discrimination. Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) ("To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination."); see also Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997) ("To prevail on her § 1983 equal protection claim, Robinson was required to prove that she was subjected to

---

[12]     Plaintiffs' papers indicate some confusion about the nature of the 1983 statute. Section 1983 does not create rights, nor is a discriminatory policy a "violation of Section 1983." Section 1983 provides a cause of action to enforce rights of independent existence when they are violated under color of law. See e.g., Stilp v. Contino, 613 F.3d 405, 409 (3d Cir. 2010) ("Section 1983 provides a civil remedy for violation of the United States Constitution by persons acting under color of law").

"purposeful discrimination" because of her sex.") abrogated on other grounds by Burlington

Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

If the claim alleged is sexual discrimination, "a plaintiff must show that any disparate

treatment was based upon her gender." Andrews, 895 F.2d at 1478. If the claim alleged is sexual

harassment based upon a hostile work environment, the plaintiff must show either that (1)

"sexual harassment that is attributable to the employer under § 1983 amounted to intentional sex

discrimination" or (2) "the conscious failure of the employer to protect the plaintiff from the

abusive conditions created by fellow employees amounted to intentional discrimination." Bohen

v. City of East Chicago, Ind., 799 F.2d 1180, 1187 (7th Cir. 1986).

As described above, Plaintiffs have failed to demonstrate disputed fact issues requiring

trial relating to either disparate treatment that they received, or a hostile work environment. As

such, their § 1983 claims are also DISMISSED. This Court need not address whether the other

requirements of a § 1983 claim—such as evidence of purposeful discrimination— have been

satisfied.

### III. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is

GRANTED. Plaintiffs' Complaint is DISMISSED.


s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: February 25, 2011